21-4127 and we'll hear from the appellant. May it please the court. You know, the last advocate was quite tall. So if I move that microphone down. Just had to point that out. I'm sensitive to us high challenge people. So I'm with you on that. Well, quite. All right. May it please the court. Actually, you can move the microphone down too. Yeah. There you go. All right. Now that you feel sufficiently offered. No, you're all right. It's a lifelong endeavor. May it please the court. My name is Aaron Bergman. I represent the plaintiff, Mr. Hampton, who is also the appellant in this case. He's also here in the courtroom. I ask to reserve two minutes for rebuttal. As I see this case, essentially, it really begins and starts or starts and ends, I should say, with Hampton's accommodation request. So that's where I'm going to start with here. When we look at the record of low, it's very clear that the Utah Department of Corrections or the DOC was really trying everything it could to avoid having to have the responsibility of providing an accommodation. What could really only be seen as grasping at straws, for instance, the Department of Corrections cited to the Mason versus Avea case and told the district court, well, under that precedent of the Tenth Circuit, this court should not move on to the reasonable accommodation analysis only if and only if Mr. Hampton isn't qualified. And that's not what the Mayer case was holding at all. What the Mayer case was holding, or the Mason case, I'm sorry, was holding was that because of the fact that an employee can be qualified with or without an accommodation, the qualification analysis at times has two prongs. One, can the person perform the essential functions of the job? And two, if and only if we find that they can't perform the essential functions, is there any reasonable accommodation that would make them qualified? With all the issues and all the arguments that everybody presented on the failure to accommodate claim, doesn't it all really boil down to whether or not an essential function of the job is to be able to safely utilize a Glock firearm? Well, I think that's certainly, I think, the argument that the Department of Corrections pushed was that the essential function of the job was the safe use of the Glock firearm. And that's the first issue that we take great umbrage with. And the reason for that is because when we look at, obviously we know here the Rehabilitation Act incorporates the standards of Title I. And so that's why throughout our briefing, for instance, you see everybody citing to the CFR regulations under 29 rather than 10, which is the Rehabilitation Act. But under 29, the definition of an essential function are the fundamental duties of the job that the individual holds or desires. We can't say that the Glock is the fundamental duty, but how do you get around the fact that they, to get the job, they require him to test on a Glock firearm? And so he qualifies and then he says, but I really, because I only have two words a minute. Well, isn't that by definition an essential function of the job? Because to get the job, he had to qualify on that firearm. It's almost akin to having a job requirement where you have to, say, type 100 words a minute and then you get the job and then you say, but, you know, now that I've gotten the job, you know, I really can't do that on a consistent basis. I can only type 20 words a minute. Well, an essential function of the job is whatever the job requirement was to get it. And great, great question. And the reason why, and I wouldn't say we're getting around that. Well, I would say if you look at, and that's why we cite to the EEOC technical manual, when it talks about an essential function analysis, they're not looking at the manner in which the job is done. If that's what we do, if that's what we do is transmute the essential function analysis down to how the employer has decided, oh, well, I'm going to impose a rule here, and this is the equipment that we're going to use, and so, therefore, that's the essential function. If we do that, then what we've essentially done is we have allowed the employer to circumvent the reasonable accommodation requirement, which is why we brought up the U.S. Airways v. Barnett case, was because the United States Supreme Court there said very clearly that look, you can't just simply say, oh, well, we have a policy, and that's how we do it, and, therefore, I don't have to accommodate you. And so that's why when we cite it to the EEOC technical manual, it makes clear that for the EEOC's part, and I understand this is persuasive authority, it's not binding on you, but from the EEOC's perspective, when it does an essential function analysis, it asks, it doesn't look at the manner in which the job is performed, it looks at the function and outcome to be achieved. And so when, and that was also reiterated also in the Ninth Circuit court case that we cited to, I'm trying to remember the name of it at this point in time, but basically it was dealing with UPS drivers who did not want to, who couldn't, they were deaf and they couldn't take the hearing test at the Department of Transportation, and so required, and under UPS policy, you had to take that hearing test. And UPS came in front of the court and said, well, that hearing test is part and parcel with the essential function, the essential function being effective communication and safe driving. And the Ninth Circuit said, no, there's a critical distinction between what is the essential function, safe driving or effective communication, versus how the employer has decided to achieve that. So is there a dispute of fact in this case about what an essential function is? I think there most certainly is, and that's why we were saying to the court down below repeatedly, you can't say that this is an essential function and we give these equipment modification kind of hypotheticals and those things, but even more than that, I think the biggest thing that is key to whether there's a dispute as to the essential function is in the district court's own ruling, where the district court stated that the parties dispute whether or not carrying a firearm is an essential function. Now, notably, the one that was saying it wasn't an essential function was the department. And so based on that, she said, however, the district court stated, however, while the parties dispute that, there's no dispute that you have to qualify with the gun. But we're not here talking about Mr. Hampton trying to get an exception from the qualification standards. He qualified. He's not sitting here saying, well, like you saw in the, I can't remember if it was the Henniger case, where the individual was basically saying, I don't want to have to go do the post-certification. That's not the case here. Hampton is qualified. And so I think it's very important for this court, and a big important issue in this appeal, is this fact that an employer can't simply say, oh, well, we made this policy, and that's an essential function. And I understand we give due deference to the court about what the job is. But at the end of the day, it's a real easy question. Can he do the job? And if he can do the job, that's it. Then you move on to the reasonable accommodation request issue. But I think that's where the rubber meets the road. I mean, the question is whether or not it's plausibly reasonable accommodation to require the facility to deviate from its Glock-only policy, and you're relying on Barnett. Well, Barnett, in fact, said that it's not a plausibly reasonable accommodation to require the employer to deviate from a collective bargaining agreement, to deviate from its policy. And so it seems to me that best-case scenario, just pressing you a little bit maybe, is why shouldn't we say, well, it's not a plausibly reasonable accommodation to require deviation from the Glock-only policy since, you know, everybody seems to agree that that is, you know, the neutral rationale that the department gave? Judge Bacarach, I'm not trying to flatter you. Another good question. Well, it's working. It's working. Good. Well, I'm making up for my height. No, here's the issue. In the Barnett case, the U.S. Airways Barnett case, the court stated that this is not a typical or reasonable request in the ordinary run of cases, which obviously is an issue that the district court in my client's case never got to. But let's assume it did, like you're proposing. Okay. And the court said, well, that's not ordinary in the reasonable run of the – it's not reasonable in the ordinary run of cases. In the Barnett case, the reason why the court said that it wasn't reasonable in the ordinary run of cases was because the thing that you were asking, namely to circumvent an employer's established seniority system, could very well interfere with the employment expectations of other employees. And so you need to show us some special circumstances, i.e., some indication why other employees would expect this to have exceptions, to make your request reasonable. Otherwise, we're not going to say it's reasonable. Now, let's apply that to Mr. Hampton's case. With Mr. Hampton's case, let's say, for instance, we were to say, well, Mr. Hampton is asking for an accommodation request that directly relates to the employer's safety policy, and we don't think that in the ordinary run of cases that's reasonable. But what if there's special circumstances? What if there's special circumstances that indicate that the policy itself creates a safety issue that was unforeseen at the time the policy was enacted because of the individual's particular disability? Well, then maybe it is reasonable. But we never got there with the district court, because the district court simply didn't go there because it nixed it, as you know, on the issue of whether or not it is an essential function. But if I could, I'll go to the ‑‑ unless there's any other questions on that point, I'll go to the essential function issue, or the ‑‑ Retaliation? No. I'm going on. Well, that's fine, because I have another question on essential function. What, in your view, define the essential function here in your perspective? In my view, the essential function, in fact, if you look at volume three of the record, it's where it's actually they're citing the policy itself. And you look at volume three, and they're citing the rationale of the policy. And it sets forth all the reasons why they have firearms, to protect the public, to protect our property, to protect this, protect that. Those are the essential functions. I mean, we have these firearms as a necessary evil, because we know that we're dealing with, you know, people who have violent, you know, backgrounds and those kinds of things, and we've got to protect ourselves, and we've got to protect the public. But that means we have to be able to use these effectively and safely. I think if I were to just summarize it, it would be the safe and effective use of firearms. That's the essential function. So is this really an undue burden question then? In relationship to, yes. Yes, it is. And so that was another issue was, by doing this, the Department of Corrections was really trying to curtail its real burden at trial, or real burden in front of the jury would be, this is an undue burden for us to give you a Springfield 1911. Can I just stop you there? But why wouldn't you define the essential function then as using a Glock or equivalent? Say that again. I'm sorry. Why wouldn't you define the essential function as the ability to use a Glock or the equivalent? Well, you could say that, the Glock or the equivalent. I mean, I'm just saying it broadly as, you know, the DOC doesn't just use Glocks. They use other guns, too, if you look in their policy. They use AR-15s. They use shotguns. They use those kinds of things. So I'm looking at the policy more broadly and saying, why do we have firearms? Why do we let our employees to carry around firearms that could potentially, as the last case showed us, potentially kill somebody? Why do we do that? The essential function of the job when someone asks for a permanent arm post is, okay, we've got to make sure this person can safely and effectively use their primary handgun. And to Mr. Hampton's credit, he knew that it had to be department issued. He couldn't just bring his gun from home. He's not asking to do that. He's saying, look, can we make an exception where I can get a different brand of firearm because in my judgment it would be safer? And I've totally blown through my rebuttal, and I haven't gotten to the rest of my argument, but that's my own fault. Is there any other questions? You're welcome to follow up. No, no, no. Okay. Okay, thank you. Thank you. Thank you. Good morning, Your Honors. May it please the Court. I'm Joshua Davidson, Assistant Utah Solicitor General, on behalf of the appellee of the Department of Corrections, or UDOC. The Court should affirm the district court's judgment in all respects. The district court correctly granted summary judgment in favor of UDOC on Hampton's three Rehabilitation Act claims, failure to accommodate, retaliation, and disparate treatment. Because the focus was on the failure to accommodate claim, I'd like to start there. Hampton failed to satisfy his initial burden of showing a facially reasonable accommodation. A request to be relieved from an essential function of a position is not, as a matter of law, a reasonable or even plausible accommodation. Here, qualifying on and using only department-issued handguns as a primary duty weapon is an essential function of the job. I'll just stop you there. Your opposing counsel said he is not requesting to use a non-departmental issued firearm. Can you respond to that? Yes, because the firearm policy, which has been enacted since October 2014, states what department-issued handguns are, and the only authorized department-issued handguns for primary duty weapons are the Glock platform guns. So he's asking to use a non-department-issued, non-authorized handgun as his primary duty weapon, and that is asking to be excused from the essential function of using only department-issued handguns. And this is a policy that has been job-related, it's uniformly enforced, the department has never deviated from it, and it's business-related. Well, sorry, to follow up then, could you respond to his argument also that you're stating that's the policy and there are no accommodations? And can you do that? Just say, well, this is the policy, there's no accommodations? Well, I mean, it's a safety issue. You know, I think that they can say what, you know, they've gone to a limited weapons platform, it is a safety issue, it was brought upon, there was an audit that was done before, there was all these problems that were identified when people used their guns, and so they've established this, you know, as a safety issue to use a limited Glock platform. It seems like Barnett says you can't do that. You can't just rely, you can't just point to the policy. We're not just pointing to the policy, we're pointing to, you know, the practice and the, you know, what is needed to essentially, you know, do the job. Every other employee is using a Glock platform gun. If there were to be a problem, if Hampton were to go down, and he had a Springfield 1911, no other employee would know how to use that gun because they're not trained on it. The Springfield 1911 gun carries seven bullets, where the Glock platforms carry 15 and 17 in the magazine. It's a very different gun, and it's not supported by the limited platform that they chose for safety. You know, even if, you know, he had shown that it was a facially reasonable accommodation, this Court could affirm the judgment on the alternative ground that the undisputed evidence showed that the requested accommodation would impose an undue hardship on UDOC. Why should we reach that question? That seems like a really fact-intensive analysis. Why should we do that? Why should we reach the undue burden question when the district court didn't even get there? Because the parties had the opportunity to brief it before this Court could affirm on any basis in the record, and the undisputed evidence shows that it would require a fundamental alteration to UDOC's program. You know, the Springfield is a completely different weapon from the Glock platforms. It is one that UDOC does not train on and doesn't have armorers for. There are 80 firearms instructors that would need to be trained on the new weapon. There are 45 armorers that would have to go through specialized training on how to repair a Springfield 1911. And the policy of the UDOC is that there always has to be a training instructor on staff at all times. There always has to be an armorer on staff at all times that can address these potential problems. And again, adding the Springfield platform would create a safety issue for UDOC. With respect to all the officers using Glocks, if you see an officer with a sidearm, you know that that is a department-issued handgun. You know that it has been maintained by the armorers. You know that the person has been trained on using that. If there was a prison disturbance or a riot that they had to be called to, everyone would know how to pick up a Glock 17 and then use it. This evidence is unrefuted, and it favors UDOC and is the affirmative defense of undue hardship. Unless there are any questions on failure to accommodate, I would like to move to the retaliation claim. So, Hampton failed to satisfy his prima facie burden of showing a causal connection between the complaint of action and his accommodation request. Hampton's retaliation was based on two things. First, his termination, and second, his assignment to an unarmed position as temp rover. Hampton failed to demonstrate a causal connection between his request for a Springfield 1911 and his termination. It is undisputed that at the time that Warden Benson made the decision to terminate Hampton's employment, Benson had no knowledge of the request to use a Springfield 1911. Question. The district court relied on Document 79-1. That is a form that the defendant created that you attach to your reply brief. That was not a joint document. That document lists in fact number 58 of your motion undisputed. The district court used the word conceded in citing this document unilaterally created by defense counsel as the concession. That's just a factual mistake that the district court made, isn't it? No. They never conceded document 58. On pages 38 and 39 of their response brief, they specifically disputed fact number 58 based on the policies that would have required conveying the accommodation request to Mr. Benson. But the undisputed testimony from Benson is that he was not apprised of it. The undisputed testimony from Hampton is that he only spoke to Wilde and Knorr. The undisputed testimony from Knorr is that he did only spoke to Pope, Wilde, and Hampton. He did not speak to— So what about—can you not infer knowledge of the decision maker if there is a policy that specifically requires the subordinate to communicate the request for an accommodation to the decision maker? Because that's what they had argued on pages 38 and 39. I think that would be just pure speculation. Like, notwithstanding what should have happened, it didn't happen in this case. All of the testimony of the people involved was that Benson didn't know. The chain of command— So when the defendant denies knowledge, the defendant's always going to get summary judgment unless the plaintiff has some sort of way of smoking gun of saying, oh, no, he conceded that he knew and he was lying in his deposition. You can't infer that a department of corrections complies with its policies of requiring the accommodation request to the decision maker if that's expressly required by the policy? You can't infer that when the deposition testimony from those involved was it didn't happen. All right. So that would just be pure speculation. And even if there was causation that Benson knew, we would still win because UDOC had a legitimate, non-discriminatory reason for the termination. What was that? The administrative review. The administrative review was conducted relating to certain work incidences that occurred by Hampton in late June of 2017. Lieutenant Price conducted the administrative review, and the department found that Hampton was involved in a VKS incident that created a hazardous environment by handling a weapon that he'd never been trained on. Hampton's involvement in the dead bird incident risked security over the department by putting the dead bird's priority over the security of the prison, and Hampton was not truthful during his interview in the written statements about the VKS incident. It is undisputed that Hampton was involved in both of these incidences. He admits that he took the magazine out of the VKS gun that the pellets dropped on the ground. He was looking for them. You know, that's undisputed. How do you respond to his pretext argument that there was another department employee that Mr. Benson knew was involved in both the pepper gun incident and the dead bird incident? Well, there's no evidence that Benson was aware of the other employee in the VKS incident. Hampton said he witnessed it, but he never mentioned it in the administrative review. He never reported it. He never mentioned it to Lieutenant Price, and Benson wasn't aware of it. And also, there is no comparator that this person was a probationary employee. Yeah, but you didn't make that argument in district court. I mean, that is true that these two comparators were not probationary employees, but I didn't see where you made that argument in the summary judgment briefing, did you? Well, it's his burden to show pretext. No, I didn't make that argument. But the argument was made that Benson did not know, and it's undisputed that he did not know the VKS incident. With respect to the chapel officer involved with the dead bird, the Lieutenant Price's testimony that she was misinformed on the identity of that chapel officer and didn't become aware of that until days before her deposition. So, you know, it doesn't create an inference of pretext that these people were not disciplined when they weren't properly identified, and Benson wasn't aware of the VKS one. I have a couple of minutes left, so let me turn to... Do you have any more questions on retaliation? Okay. Then let me try the disparate treatment claim. The district court correctly granted summary judgment because Hampton failed to show that his disability was a determinative factor in UDOC's employment decisions. It requires affirmative evidence that Hampton's disability was a determining factor in UDOC's decision. Hampton suggests that Director Pope's designation of him as ineligible for rehire shows evidence of a policy, but that decision was made two days after he was terminated, and the reasons stated for that were clearly listed in the memorandum that Hampton was ineligible for rehire due to his honesty issues and his failure to follow simple security rules and practices. Hampton also argues that there was an unspoken adverse action policy against disabled employees, but that is belied by the evidence that when he requested additional training at the academy, he was given training. Horsley gave him a blue gun, worked with him for 45 minutes, taught him the draw strokes, showed him what would be involved. So it's not a reasonable inference that there's some unspoken policy when the undisputed facts are that it assisted him when he requested it. I see that my time is up. If there's any more questions, otherwise we'd ask the court to affirm. Okay, thank you. Amy, if they used up all their time. Okay, thank you. This matter is submitted. Both sides, I thought, did an excellent job in your briefing and in your arguments. We appreciate your excellent advocacy. The last matter that we'll hear today is Truman v. Johnson, 22-4017.